**Ted H. JEFFERSON, D.O.; and Ted H. Jefferson, D.O., Inc., Appellants**

v.

**Ronald D. EGGEMEYER, Appellee**

2015–SC–000625–DG

Supreme Court of Kentucky.

April 27, 2017

COUNSEL FOR APPELLANTS: E. Frederick Straub, Jr., James Richard Coltharp, Jr., Whitlow, Roberts, Houston & Straub, PLLC

COUNSEL FOR APPELLEE: Hans George Poppe, Jr., Warner Thomas Wheat, The Poppe Law Firm

**REVERSING AND VACATING**

OPINION OF THE COURT BY JUSTICE KELLER

Ted H. Jefferson, D.O. and Ted H. Jefferson, D.O., Inc. (Dr. Jefferson) appeal from the Court of Appeals opinion that reversed the trial court's denial of Ronald D. Eggemeyer's motion for a new trial. Dr. Jefferson also appeals from the affirmation by the Court of Appeals of the trial court's imposition of sanctions. For the following reasons, we reverse the Court of Appeals, and we vacate the trial court's imposition of sanctions.

## I. BACKGROUND.

Eggemeyer fell on October 31, 2008, injuring his left upper extremity. On November 4, 2008, Dr. Jefferson performed surgery to repair a left humerus fracture. The fracture did not heal, and he performed a

second surgery on February 27, 2009. Following that surgery, Eggemeyer continued to experience pain, and he sought treatment from Dr. Holcomb in late September. Dr. Holcomb prescribed antibiotics and referred Eggemeyer to the Cleveland Clinic, where Eggemeyer underwent surgery on October 13, 2009 and February 4, 2010.

On September 17, 2010, attorney Hans Poppe sued Dr. Jefferson on behalf of Eggemeyer alleging two primary theories of liability: (1) Dr. Jefferson made mistakes during the initial surgery that resulted in the failure of the fracture to heal; and (2) following the second surgery, Dr. Jefferson failed to timely identify an infection, which necessitated the two Cleveland Clinic surgeries.

The parties began to try this case before a jury on August 13, 2012. That trial ended on August 16, 2012, when the judge declared a mistrial because Dr. Jefferson had mentioned insurance several times in violation of the court's order. Following the mistrial, Eggemeyer moved the court to find Dr. Jefferson in contempt, civilly and criminally, and for the imposition of sanctions and costs in the amount of $64,483.82. In support of his motion, Eggemeyer argued that Dr. Jefferson, during his testimony, intentionally and repeatedly violated the court's orders not to mention insurance, which forced the court to declare the mistrial. Dr. Jefferson also filed a motion for sanctions and costs in the amount of $42,048.80. In support of his motion, Dr. Jefferson argued that Eggemeyer's counsel was responsible for the mistrial because his questioning left Dr. Jefferson with little choice but to mention insurance. The court abated the parties' motions for sanctions and costs pending completion of a second jury trial.

In addition to moving for sanctions and costs, Eggemeyer moved the court to set a second trial date as soon as possible. Dr. Jefferson's attorney asked for a delay, noting that it was likely he would be undergoing surgery in September 2012. Despite counsel's request for a later trial date, the court set the case for re-trial in November 2012. Dr. Jefferson obtained new counsel, attorney Scott Whonsetler, and the second trial took place as scheduled.

On three separate occasions before the second trial began the court stated that the parties would not be permitted to offer any evidence or theories of liability or defense that: had not been admitted during the first trial; was not in a Kentucky Rule of Civil Procedure (CR) 26 disclosure; was not contained in records previously admitted; or had not been in a deposition taken prior to trial. During his opening statement on behalf of Dr. Jefferson, attorney Whonsetler stated that Eggemeyer developed an antibiotic resistant staph infection, MRSA, as a result of Dr. Holcomb's treatment. Eggemeyer objected. At the ensuing bench conference, attorney Poppe argued that Whonsetler's statement about MRSA had violated the court's order against raising any new theories. Poppe also stated that Whonsetler had raised a number of other new theories. The judge stated that he thought he had heard a number of new theories; however, he permitted Whonsetler to finish his opening statement. After Whonsetler had finished his opening statement, the judge dismissed the jury for the day and, following a brief discussion, told the parties to be prepared to argue the matter in the morning. We note that Poppe did not request an admonition at that time.

The next morning, Poppe outlined twelve new theories he believed Whonsetler had raised during his opening statement. After an hour long discussion about what constituted a theory, what constituted a fact, and what was or was not new evidence, the court stated that the primary

issue was whether Dr. Jefferson had provided appropriate notice to Eggemeyer of the issues being discussed. The court then stated that it was going to rule generally that, if there was no evidence in the record to support Dr. Jefferson's new theories, they would not be admissible. Furthermore, the court stated that it would admonish the jury. Although Poppe asked the court to specifically admonish the jury about each of Whonsetler's "misstatements," the court gave the following general admonition:

I do want to give you one admonishment this morning, ladies and gentlemen. I told you yesterday at the beginning of the trial that the opening statements by the counsel are not proof, they are not evidence in the case. I said something like—it's like the preview of coming attractions it's a—it's a statement by the attorneys of what they believe their case will be, what they believe the evidence will be, that sort of thing.

You may have taken notes on what the opening statements were or you remember in general what the claims were by the attorneys. The rule is that even though it's their belief of what their case will be, what the evidence will be, their statements have to be supported by the evidence. And we're getting ready now to start with the evidence, so if it is the case that at the end of this trial that you get to the point and you say—well, one attorney or the other I remember saying this or that, and I don't see any proof in the record that supports that, then you would be required to disregard that statement by the attorney if it's not supported by the evidence in the record. Maybe you won't get to that, maybe you will.

Following this admonition, Eggemeyer presented his first witness. The court then recessed for lunch and the judge provided the parties with a more specific outline of his evidentiary ruling from earlier that morning. Although we do not have a copy of that document, we do have a copy of the court's Order as to Rulings at Trial, which was entered after the verdict. Based on our review of the record, that order, set forth in part below, appears to be consistent with what the judge said during the parties' discussions of the issues.

The Court previously ruled that the parties were bound by the evidence of record prior to the trial and to the theories of liability disclosed by Rule 26 disclosure, deposition, and prior trial testimony. Because this case resulted in a mistrial four (4) days into the first trial, the Court desired to limit costs and expenses occurred [sic] by both sides in retrying the case. The retrial was set to begin eighty[-]nine (89) days after mistrial in order to avoid delay in resolving the case.

A hearing was held on the record in which counsel for both parties set forth their positions. Time constraints prohibit a complete recitation of the proceeding. The record will reflect the Court's concerns as to lack of notice to the Plaintiff of theories of liability/causation that were not provided to Plaintiff. These rulings were stated at trial, to be entered in this written Order subsequent to trial.

The items to which Plaintiff's counsel objected will be addressed individually:

1. New Fracture to Plaintiff's Arm—

Defense counsel stated to the jury that a second fracture to the arm, subsequent to Defendant's treatment, caused damage to the Plaintiff. There is no evidence in the record that any witness testified or implied that a second fracture occurred or that, if it did, it caused any of Plaintiff's claimed damages. It is not in the CR26 e, any deposition, nor

did Defendant so testify in the first trial. Defendant is not permitted to present evidence or argument that a second fracture occurred or that it caused damage.

2. Presence of Sclerotic Bone—

No evidence exists that the presence of sclerotic bond [sic], which was in the knee, caused or may have caused Plaintiff's damages. Defendant is not permitted to present evidence or argument that sclerotic bond [sic] in the knee caused or may have caused damages.

3. Problem from Prosthesis [1]—

There is evidence of a possible problem from the prosthesis, other than inability to place screws into prosthesis, and such is admissible only if there is testimony of pre-trial record that an expert witness opines that it is relevant to causation.

4. Permanent Swelling—

Only if the pretrial record contains evidence of permanent swelling is it admissible at this time.

5. Hypertension, Smoking, Alcohol—

Only if the pretrial record contains evidence of hypertension, smoking, or alcohol is it admissible at this time.

6. Bone Morphogenic Protein (BMP)—

Defense counsel states that BMP is identical to the term "bone graft". "Bone graft" appears in the pretrial record. Only if the pretrial record contains evidence of BMP as to causation of Plaintiff's damages is it relevant and admissible.

7. Second Plate in Arm "Absolutely Improper" [2]—

Testimony or argument as to the propriety or impropriety of applying a second plate regarding causation is not admissible absent pretrial record containing such evidence.

8. Dr. Holcolm's [sic] Antibiotic Caused MRSA [3]—

It appears there is no evidence in pretrial record that the antibiotic prescribed by Dr. Holcolm [sic] caused MRSA. If so, it is not admissible in proof or argument.

9. Two (2) Screws Below Fracture Line [4]—

If there is no evidence in pretrial record that Defendant installed two (2) screws, as opposed to one, below the fracture line, such is not admissible.

10. Phone Call from Plaintiff to Defendant [5]—

It appears Defendant testified prior to this trial that he did not recall a certain phone call from Plaintiff or his wife. He would now testify that he recalls the phone call and his response was to direct Plaintiff to go to the emergency room and to have them call him at a clinic he was attending. It is possible that Defen-

1. Eggemeyer had a prosthetic device in his shoulder from a prior surgery.

2. In opening statement, Whonsetler said that the use of two plates by surgeons at Cleveland Clinic was "absolutely improper."

3. Whonsetler admitted that there was no evidence that Dr. Holcomb's treatment caused or contributed to Eggemeyer contracting MRSA. However, he argued that such an inference would be reasonable and permissible.

4. Eggemeyer theorized that Dr. Jefferson's first surgery failed because Dr. Jefferson did not put a sufficient number of screws in the hardware below Eggemeyer's fracture.

5. Mrs. Eggemeyer testified in the first trial that she had called Dr. Jefferson after the September 2009 office visit to advise him that her husband's condition had dramatically worsened. Although her testimony about when that phone call took place changed, Mrs. Eggemeyer's testimony in the second trial was consistent with her testimony in the first trial.

dant has, somehow, now recalled the exchange and so he is permitted to so testify. Plaintiff may, of course, cross-exam as to the recollection.

11. Three (3) Day Delay Before Plaintiff Went to Defendant [6]—

There is apparently evidence that Plaintiff was not seen by Defendant until three (3) days after he fracture[d] his arm and the fact is admissible. If there is no evidence in pretrial record that such relates to causation, it may not now be claimed.

12. Physical Therapist Hammonds Identified as an Expert—

Plaintiff claims that Defendant's counsel told the jury that Physical Therapist Hammonds would be called as an expert. The Court previously ruled that Physical Therapist Hammonds could be called as a witness but not as an expert.

The parties and the court then held another lengthy discussion about the propriety of the court's ruling; however, the judge did not alter that ruling.

Based on our reading of the preceding order, the judge specifically precluded Dr. Jefferson from presenting any evidence that: Eggemeyer had a second fracture between his last visit with Dr. Jefferson and his first visit at the Cleveland Clinic; sclerotic bone found in Eggemeyer's knee contributed to his shoulder condition; use of two plates by physicians at the Cleveland Clinic to repair Eggemeyer's fracture was improper; and the physical therapist was an expert witness. As to the remaining issues, Whonsetler stated that he would approach the bench before presenting any such evidence.

The trial then proceeded. One of Eggemeyer's expert witnesses, Dr. Pugh, testified that, during his first surgery, Dr. Jefferson: could have used other surgical approaches; only placed one screw below the fracture line; and could have placed more screws there. Those choices by Dr. Jefferson could have contributed to Eggemeyer's failure to heal following that surgery. However, Dr. Pugh's primary complaint about Dr. Jefferson's treatment was his failure to appreciate and test for infection following the second surgery. According to Dr. Pugh, he would have been concerned about an infection as early as April, and Dr. Jefferson should have requested an appropriate blood work-up at that time. If Dr. Jefferson had detected Eggemeyer's infection earlier, the Cleveland Clinic surgeries could have been avoided. We note that, during Dr. Pugh's testimony, both parties questioned Dr. Pugh about the use of BMP and Dr. Pugh testified about the impact smoking and hypertension can have on bone healing, Poppe did not object to this testimony.[7]

On the morning of the fourth day of trial, Dr. Jaffe, one of Dr. Jefferson's expert witnesses, testified. When attorney Thompson, Jefferson's co-counsel, began questioning Dr. Jaffe about what Eggemeyer's post first-surgery x-ray showed, Poppe objected. During a bench conference, Poppe argued that Thompson was going to question Dr. Jaffe about how many screws were below the fracture line, a fact that had not been disputed during discovery or during the first trial. The judge, again noting a lack of notice, stated that Thompson was not permitted to ask whether there were two screws. Thompson did not pursue that line of questioning with

---

**6.** During his opening statement, Whonsetler said that this delay in seeking treatment made repairing Eggemeyer's fracture more difficult.

**7.** Poppe did object to Whonsetler questioning Dr. Pugh about an article about BMP but only to the extent that Whonsetler had not laid the proper foundation.

Dr. Jaffe, asking instead if Dr. Jaffe believed that Dr. Jefferson used the appropriate hardware.

Later that day, Dr. Jefferson testified. During Dr. Jefferson's testimony, Whonsetler asked Dr. Jefferson if there was any evidence of sclerotic bone. Dr. Jefferson stated that there was evidence of sclerotic bone in Eggemeyer's wrist. Poppe objected and, during a bench conference, Whonsetler stated that he was only mentioning sclerotic bone to understand Dr. Jefferson's thought process when contemplating surgery. The court asked if there was any evidence of sclerotic bone from the first trial and both attorneys stated that there was not. The court, again noting that there had been no notice, sustained Poppe's objection.

Approximately twenty minutes later, Whonsetler asked Dr. Jefferson if the x-rays showed that there were actually three screws below the fracture line. Dr. Jefferson said that there were, and Poppe immediately objected. The court sustained his objection, again noting that there had been no evidence that there was more than one screw below the fracture line prior to this trial. Poppe did not request an admonition or any other relief.

During Dr. Jefferson's cross-examination, Poppe stated that Whonsetler began questioning Dr. Jefferson about a telephone call Mrs. Eggemeyer made after the last visit to Dr. Jefferson. Whonsetler objected arguing that Poppe was injecting Whonsetler's statements from his opening statement into evidence. Whonsetler requested an admonition and the court admonished the jury, for a second time, that what the attorneys said in opening statement was not evidence and the jury should base any determination on the evidence.

Dr. Pugh, Eggemeyer's expert witness, testified that one of the reasons Eggemeyer's fracture failed to heal was because Dr. Jefferson only placed one screw below the fracture line. During Dr. Jefferson's direct testimony, Whonsetler asked him if there were, in fact, three screws below the fracture line. Dr. Jefferson agreed that there were three screws. Poppe objected arguing that there had been no evidence that there were three screws below the fracture line, and the court sustained his objection. Poppe did not request an admonition or any other relief, and Dr. Jefferson did not mention the number of screws below the fracture line during the remainder of his testimony.

During his closing argument, Whonsetler stated, "You heard today that there were three cortical screws that were done in November. When Dr. Pugh said there was only one, and there were three beneath the fracture line." Poppe objected, noting that the court had sustained Poppe's objection regarding the number of screws. The judge stated that Whonsetler had violated a court order by mentioning more than one screw. Poppe asked the court to admonish the jury that there was no evidence that there were three screws below the fracture line and that Whonsetler had violated a court order by saying that there were. The court admonished the jury as follows: "Ladies and gentlemen, there's been no testimony in this case that there were three screws below the fracture line so you should disregard that statement." Immediately thereafter, Whonsetler said, "Ladies and gentlemen, you will have the x-rays. Take a look ... and you will see that below the fracture line there are three screws that go cortices to cortices." Poppe reiterated his objection. The court advised Whonsetler to move on to something else and stated that it would "decide how to handle that." We note that Poppe did not request another admonition or any other relief.

Following the jury's nine to three verdict in favor of Dr. Jefferson, Eggemeyer moved for judgment notwithstanding the verdict. The court denied that motion for two reasons: (1) Eggemeyer had not made a motion for directed verdict at the close of all proof; and (2) despite Eggemeyer's argument that Dr. Jefferson's attorney "made inappropriate comments" and "elicited inadmissible evidence," there was "sufficient evidence otherwise to have presented the case to the jury."

The court then issued an order granting Eggemeyer's motion for sanctions. In doing so, the court found that the following occurred during the first trial: (1) Eggemeyer filed a motion in limine to preclude introduction of collateral source payments, which the court granted; (2) Dr. Jefferson's counsel advised Dr. Jefferson to refrain from mentioning insurance; (3) Dr. Jefferson mentioned insurance in response to a question about use of an external bone mass stimulator; (4) at a bench conference Eggemeyer's counsel asked for either a mistrial or an admonition, and the court admonished the jury not to consider insurance as the existence of insurance was irrelevant; (5) the court again directed Dr. Jefferson's attorney to tell Dr. Jefferson not to mention insurance; (6) within 30 minutes, Dr. Jefferson mentioned insurance twice; (7) Eggemeyer moved for a mistrial, which the court granted; and (8) Eggemeyer moved for sanctions. The court then stated as follows:

> The Court[8] determined that Dr. Jefferson had violated the Court's Order repeatedly and agreed with Plaintiff that the doctor was in contempt of court. The Court opted to not sanction the doctor at that time, but rather to treat the matter as a civil contempt and wait until after

the second trial to see if the doctor would cure or mediate his contempt and then determine whether, and to what extent, sanctions were justified.

Additionally, after the mistrial, the Court instructed counsel that the case would be retried as it now sits. There would be no new experts or theories or anything else that was not disclosed in the first trial. This was in an effort to keep the costs to a minimum and to shorten any delay in retrying the case. At the second trial Dr. Jefferson was primarily not represented by the same attorney nor law firm that represented him through the ending of the first trial. Attorney Rick Straub was replaced by attorney Scott Whonsetler (Attorney Straub had medical issues that precluded his participation but his firm provided support for attorney Whonsetler).

At a pretrial conference the Court advised Mr. Whonsetler and Plaintiff's counsel, Mr. Poppe, that there were to be no new theories in the case and no new evidence to which the opposing party would have no notice. Mr. Poppe requested that Mr. Whonsetler acknowledge that he would not be attempting to introduce any new theories in the case. Mr. Whonsetler stated that he may not practice the case exactly as did Mr. Straub. The Court again instructed that if either party had no notice of a theory in the case it could not be newly introduced in this second trial.

In his opening statement to the jury Mr. Whonsetler made reference to the jury that a reason why Dr. Jefferson was not liable for Plaintiff's damages was that Plaintiff may have re-fractured his arm. This was a new theory in the case, never before mentioned or eluded [sic] to by

---

8. We note that the court, in its orders, is not consistent with regard to capitalization of the word "court." We have kept the court's original capitalization intact rather than changing it to make it consistent.

any expert or any other fact in the case. Mr. Poppe objected to the statement. The Court admonished Mr. Whonsetler that he had knowingly and intentionally violated the Court's order and that the new theory of a refractured arm would not be allowed.

The actions of Mr. Whonsetler are attributable to Dr. Jefferson for two reasons. First, a client is responsible for the actions of his attorney. Second, Dr. Jefferson knew that the 'second fracture theory' was a new theory unsupported by the evidence.

Only Dr. Jefferson was in a position to testify as to a possible new fracture. The Court inquired of Mr. Whonsetler as to when Dr. Jefferson believed that Plaintiff had refractured his arm. Mr. Whonsetler stated that it was after Dr. Jefferson's deposition and prior to the first trial. The Court asked that, if Dr. Jefferson believed before the first trial there was a second fracture, which may well absolve him of all liability, why Dr. Jefferson did not so testify in the first trial. Mr. Whonetler stated that he did not know how to answer that question.

The obvious reason is that Dr. Jefferson concocted the second fracture theory after the first trial. He was prepared to so testify in the second trial with his attorney setting the ground in the opening statement to the jury. Dr. Jefferson knew or should have known that the Court had banned any such new theory. If he did not know, he at least knew that his testimony was to be truthful. It is clear that in discussing trial strategy, Dr. Jefferson and Mr. Whonsetler had to have discussed the new theory or Mr. Whonsetler would not have told it to the jury.

Dr. Jefferson intentionally defied the Court's order in the first trial on three occasions. His actions constituted civil contempt. It was civil contempt rather than criminal because the Court opted to see if he would purge or otherwise mitigate his contempt in the second trial. He was prepared to violate the Court's order by testifying to a new theory in the case. He permitted his attorney to introduce it in opening statement.

The Court finds that sanctions are appropriate given the contemptuous conduct in the first trial alone. Far from purging or mitigating his conduct, Dr. Jefferson compounded it in the second trial."

The court then awarded Eggemeyer the costs and attorney fees he requested, reducing the hourly rate for the attorney fees from $375.00 to $250.00, for a total of $58,858.82. We note that the court found Dr. Jefferson personally liable for the sanctioned amount.

Eggemeyer then moved for a new trial and for default judgment on the issue of liability. Dr. Jefferson filed a motion to alter, amend, or vacate the sanctions order. In support of his motion, Eggemeyer continued to argue that he was unduly prejudiced because Dr. Jefferson introduced evidence of new theories at the second trial in violation of the court's order. In support of his motion, Dr. Jefferson argued that he was goaded into mentioning insurance during the first trial by Poppe and that he had not introduced new theories during the second trial. The court denied Eggemeyer's motion finding that:

Despite the unethical attempts to violate the court's order and to introduce suggestions of theories unsupported by the evidence, the Court finds that the relief Plaintiff seeks is not appropriate. Plaintiff's goal of setting aside a verdict for the defendant, along with adjudging liability against Defendant and ordering a new trial on damages alone is an extraordinary measure. The Court declines

to grant the relief, primarily, because Defendant's transgressions were addressed in the second trial by admonition to the jury that lessened the impact of the actions.

At the second trial the jury was admonished that the arguments of counsel were not evidence and the case was to be decided only by considering the evidence admitted at trial. Additionally, the court admonished the jury that there was no evidence in the record of a second fracture. Plaintiff's counsel was free to argue that there was no evidence of a second fracture and there was no evidence of more than one screw below the fracture point. A jury is presumed to abide by the court's admonishment. Because the jury is presumed to have not considered Defendant's unethical attempts to sabotage the trial with evidence and theories that were nonexistent, the Court finds that a new trial, particularly with liability determined by the court, is not warranted.

The court denied Dr. Jefferson's motion to alter, amend, or vacate its sanctions order finding as follows:

The award of sanctions is for Dr. Jefferson's contempt of court. It happens that the appropriate amount of sanctions for actions sabotaging a first trial and requiring a second trial is the resulting costs incurred by the party found to be in contempt of court. It is not, therefore, an award of costs, it is a sanction for contempt. The contempt caused a mistrial. The mistrial required a second trial. It is only fair that the party in contempt bear the direct costs of the second trial caused by his actions.

Defendant also argues that a "second fracture" theory was not new at all but was actually a part of the evidence in the first trial. Because it was not a new theory, he argues, he was not in con-

tempt in the second trial of violating the court's order that no new theories were to be introduced in the second trial. Defendant argues that in the ". . . transcript of the first trial, it can be seen that Dr. Jaffe clearly testified that the change in Mr. Eggemeyer's arm could have been caused by 'some sort of traumatic event.' " He argues that the testimony was identical in the second trial when Dr. Jaffe testified that " 'there has to be some discontinuity' in the arm on the October 13 x-ray, and that 'most likely, there was some change or event that caused [the arm] to get to here' ".

The court then cited to Dr. Jaffe's testimony from the first trial and concluded that Dr. Jaffe had not testified that a traumatic event occurred between Eggemeyer's last visit with Dr. Jefferson and his first visit at the Cleveland Clinic. Rather, the court found that Dr. Jaffe's testimony, taken in context, was that "absent some trauma, the worsening [in Eggemeyer's condition] was explained by the complexity of the (original and only) fracture." The court then noted that Dr. Jefferson's argument that Dr. Jaffe's second trial testimony was consistent with the first trial testimony was an "attempt at verbal gymnastics [that] only underscores counsel's questionable tactics." We note that Dr. Jefferson correctly cited Dr. Jaffe's testimony during the second trial; however, Eggemeyer did not object to that testimony.

Eggemeyer then appealed the trial court's denial of his motion for a new trial and Dr. Jefferson appealed the trial court's award of sanctions. A divided panel of the Court of Appeals reversed the trial court's denial of Eggemeyer's motion for a new trial but unanimously affirmed the imposition of sanctions against Dr. Jefferson. As noted above, Dr. Jefferson raises two issues on appeal: whether the trial court

erroneously denied Eggemeyer's motion for a new trial; and whether the trial court erred in assessing sanctions against Dr. Jefferson.

## II. STANDARD OF REVIEW.

The issues raised by Dr. Jefferson have different standards of review; therefore, we set forth the appropriate standard when we address each issue.

## III. ANALYSIS.

**A. The trial court did not err when it denied Eggemeyer's motion for a new trial.**

 The Court will presume the trial court's denial of a motion for a new trial to be correct and will reverse only upon a finding of clear error. *Bayless v. Boyer*, 180 S.W.3d 439, 444 (Ky. 2005). If, after review, the Court finds that the evidence and the jury's verdict are not reasonably related, the Court may find the trial court's denial of a party's motion for a new trial was an abuse of discretion and clearly erroneous. *Turfway Park Racing Ass'n v. Griffin*, 834 S.W.2d 667, 669 (Ky. 1992).[9]

CR 59.01 provides that:

A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes:

(a) Irregularity in the proceedings of the court, jury or prevailing party, or an order of the court, or abuse of discretion, by which the party was prevented from having a fair trial.

(b) Misconduct of the jury, of the prevailing party, or of his attorney.

Dr. Jefferson argues that he did not engage in misconduct because he did not introduce any new theories or defenses

and, if he did, any error that occurred was cured by the court's admonitions. Eggemeyer argues, and the majority of the Court of Appeals held, that the introduction of new theories and defenses during the second trial was so egregious and so permeated the trial that the court's failure to grant a new trial was an abuse of the discretion afforded by CR 59.01. Eggemeyer also argues, and the majority of the Court of Appeals held, that the court's admonitions were not sufficient to cure the misconduct by Dr. Jefferson and his counsel. We address these arguments below.

**1. Introduction of new theories/defenses.**

 At the outset, we note that Eggemeyer states that there were "numerous violations" of the court's order throughout the trial. However, for "brevities [sic] sake each and every violation is not discussed," and Eggemeyer points to only three specific instances of misconduct: (1) Whonsetler's comments during opening statement; (2) Whonsetler's questioning of Dr. Jefferson about the number of screws below the fracture line; and (3) Whonsetler's comment about the number of screws below the fracture line during closing argument. CR 76.12(4)(c)(v) provides that the argument portion of a brief must contain "ample supportive references to the record and citations of authority pertinent to each issue of law." If a party fails to comply with that requirement, we may "decline to address" his arguments. Because Eggemeyer has only set forth supportive references to the record for the preceding three instances of alleged misconduct, we address only those three.

**9.** We note that Eggemeyer also made a motion for JNOV. Because the standard for both a motion for JNOV and for a new trial is the same, we only discuss Eggemeyer's motion for a new trial.

### a. Opening statement.

█ The purpose of opening statement is for a defendant to "briefly state his defense and the evidence he expects to offer in support of it." CR 43.02(b); *see also Fields v. Commonwealth*, 12 S.W.3d 275, 281 (Ky. 2000). The parties are granted wide latitude in making their opening statements, in part, because what is said in opening statement is not evidence. *Wheeler v. Commonwealth*, 121 S.W.3d 173, 180 (Ky. 2003), *as modified on denial of reh'g* (Dec. 18, 2003). However, that latitude is not limitless, and a party should avoid discussing matters that are not admissible. *Polk v. Greer*, 222 S.W.3d 263, 265 (Ky. App. 2007); *Mills v. Commonwealth*, 310 Ky. 240, 243, 220 S.W.2d 376, 378 (1949).

█ At the outset, we note that our analysis of this issue is hampered in part because Eggemeyer only objected contemporaneously to one of the allegedly new theories—that Eggemeyer suffered a second fracture. Eggemeyer did not object to or set forth with specificity what he considered to be the other new theories until the next day. Thus, the trial court was faced with attempting to "fix" alleged errors that had occurred the previous day. When faced with this task, the court asked Eggemeyer what relief he wanted, and Eggemeyer said he wanted the court to admonish the jury. He did not ask for a mistrial or for any other relief.

█ A jury is presumed to follow an admonition. *Mills v. Commonwealth*, 996 S.W.2d 473, 485 (Ky. 1999).

There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defen-dant; or (2) when the question was asked without a factual basis *and* was 'inflammatory' or 'highly prejudicial.'

*Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003) (emphasis in original). "[A]n admonition to the jury to disregard an improper argument cures the error unless it appears the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it." *Price v. Commonwealth*, 59 S.W.3d 878, 881 (Ky. 2001).

Although the court did not give the admonition that Eggemeyer requested, the court did correctly admonish the jury that what the attorneys said in opening statement was not evidence. Furthermore, the court said that, if the jurors found a discrepancy between what was said in opening statement and what the parties presented in evidence, the jurors should rely only on the evidence.

The majority of the Court of Appeals panel believed this admonition was deficient for two reasons: it was not given until the next day; and it did not set out for the jury which of Whonsetler's assertions in opening statement should be disregarded. As to the first reason, we discern no error in the court's delay in admonishing the jury. As the court noted when Eggemeyer objected, some of the matters discussed by Whonsetler sounded new, but the court could not say with certainty which matters were new and thus were violations of the court's order. Had the court given its admonition to the jury at the time, the best it could have done is what it ultimately did because neither party had the opportunity to adequately flesh out the issues regarding the "newness" of the theories. Giving the parties time to address with specificity Eggemeyer's objections seems to us to have been a judicious remedy, particularly when Poppe did not request an admonition until after he

had more specifically addressed those objections.

As to the second reason, as noted above, the court was unsure which of the alleged new theories were actually new at the time Eggemeyer objected. Furthermore, as evidenced by the contingent nature of the majority of the court's rulings, the court was not certain which theories were new after hearing arguments from the parties the next day.

The trial court, not the majority of the Court of Appeals, was present during the trial and was in the best position to judge the adequacy of its admonition and the impact any misconduct by Whonsetler during opening statement had on the jury. *See Clark v. Bean*, 267 Ky. 238, 101 S.W.2d 930, 931 (1937). Therefore, the trial court acted within its discretion in finding that Eggemeyer had a fair trial despite Whonsetler's opening statement.

**b. Whether misconduct permeated the trial.**

■ In addition to finding the admonition to be deficient, the majority of the Court of Appeals held that Whonsetler's misconduct permeated the trial, and the trial court "failed to take adequate measures to reign in Dr. Jefferson and his counsel" which "resulted in a defense verdict." *Eggemeyer v. Jefferson*, 2013–CA–000686–MR, 2015 WL 3643420, *13 (Ky. App. June 12, 2015), *reh'g denied* (Sept. 24, 2015). This assertion by the majority is not supported by the record, or at least those portions of the record cited by Eggemeyer. The trial court definitively ruled that four of the allegedly new theories were not to be mentioned again during trial—Eggemeyer had a second fracture between his last visit with Dr. Jefferson and his first visit at the Cleveland Clinic; sclerotic bone found in Eggemeyer's knee contributed to his shoulder condition; use of two

plates by physicians at the Cleveland Clinic to repair Eggemeyer's fracture was improper; and the physical therapist was an expert witness. Eggemeyer has not cited us to where in the record Dr. Jefferson violated the preceding order by attempting to introduce evidence on those issues. Furthermore, Eggemeyer, with the exception to statements/testimony about the number of screws, has not cited us to where in the record any evidence regarding the other allegedly new theories was offered and objected to. Therefore, we disagree with the Court of Appeals that the trial court was required to grant Eggemeyer's motion for a new trial.

**c. Whonsetler's questioning of Dr. Jefferson about the number of screws below the fracture line.**

■ During his direct testimony in the first trial, Dr. Jefferson mentioned that there were "screws" at the bottom of the plate. However, he never specifically stated how many screws were there. As set forth above, when the parties discussed the allegedly new theories the court ruled that Dr. Jefferson could testify about the number of screws below the fracture line if he had given notice to Eggemeyer that he would so testify or had actually so testified. However, if Dr. Jefferson had not done so, then he would not be permitted to testify about the number of screws below the fracture line. During his direct testimony in the second trial, Dr. Jefferson, in response to a question from Whonsetler, testified that the x-rays showed three screws below the fracture line. Poppe objected, the court sustained his objection, and Dr. Jefferson did not mention the number of screws in the remainder of his testimony.

■ As we have often stated, an appellant may not "feed one can of worms to the trial judge and another to the appellate

court." *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1976). That is precisely what Eggemeyer is attempting to do. He objected to Dr. Jefferson's testimony, the court sustained his objection, and he asked for no further relief. He cannot now claim that the court erred by not granting relief he did not seek, and the Court of Appeals erred in granting that relief.

### d. Whonsetler's comment during closing argument about the number of screws below the fracture line.

 A reviewing court may "consider whether improper argument caused or contributed to a verdict which appears to be excessive or inadequate." *Smith v. McMillan*, 841 S.W.2d 172, 174 (Ky. 1992). That determination is one that must be made on a case by case basis; however, the Court cannot ignore "the deadly effect" an improper argument may have if "repeated and reiterated in colorful variety by an accomplished orator." *Id.*

 As set forth above, during closing argument, Whonsetler said, "You heard today that there were three cortical screws that were done in November. When Dr. Pugh said there was only one, and there were three beneath the fracture line." Poppe objected, noting that the court had sustained his previous objection regarding Dr. Jefferson's testimony about the number of screws.[10] During a bench conference, the judge stated that Whonsetler had violated a court order by mentioning more than one screw. Poppe asked the court to admonish the jury that there was no evidence that there were three screws

below the fracture line and that Whonsetler had violated a court order by saying that there were. The court admonished the jury as follows: "Ladies and gentlemen, there's been no testimony in this case that there were three screws below the fracture line so you should disregard that statement." Immediately thereafter, Whonsetler said, "Ladies and gentlemen, you will have the x-rays. Take a look ... and you will see that below the fracture line there are three screws that go cortices to cortices." Poppe reiterated his objection. The court advised Whonsetler to move on to something else and stated that it would "decide how to handle that." We note that Poppe did not request another admonition or any other relief.

We agree with the Court of Appeals that Whonsetler's statements during closing argument amounted to misconduct as contemplated by CR 59.01. However, the analysis does not stop there. Because the trial court admonished the jury, we must determine if that admonition was sufficient. We hold that it was.

As we set forth above, the jury is deemed to follow an admonition unless it can be shown that there was an "overwhelming probability that the jury" could not "*and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant; or (2) when the question was asked without a factual basis *and* was 'Inflammatory' or 'highly prejudicial.'" *Johnson*, 105 S.W.3d at 441 (emphasis in original).

The court had previously sustained Poppe's objection to Dr. Jefferson's testimony regarding the number of screws be-

---

**10.** We note Dr. Jefferson's argument that the number of screws was a question of fact, not a theory, and we believe that argument has some merit. However, the issue before is not whether the trial court correctly excluded evidence of the number of screws, but whether

Whonsetler disregarded the court's order. The solution for a party or attorney who believes he has been wronged by a court's evidentiary ruling is not to defy the court but to appeal from the adverse ruling.

low the fracture line. The court's admonition during Whonsetler's closing argument specifically told the jury to ignore that testimony, implying, if not directly stating, that Whonsetler had misrepresented the evidence. Thus, Eggemeyer got, in essence, what Poppe requested. Furthermore, as we stated above, Eggemeyer's primary argument was that Dr. Jefferson had failed to diagnose the infection. Whether Dr. Jefferson placed one or three screws below the fracture line had no direct bearing on that argument.[11] Therefore, we do not believe the trial court abused its discretion when it found that, despite Whonsetler's misconduct, Eggemeyer received a fair trial.

### e. CR 60.02.

■ The Court of Appeals stated that Eggemeyer argued that the trial court should have granted a new trial under either CR 59.01 or CR 60.02. Because the Court reversed based on CR 59.01, it did not address Eggemeyer's CR 60.02 arguments. CR 60.02 provides that:

> On motion a court may, upon such terms as are just, relieve a party or his legal representative from its final judgment, order, or proceeding upon the following grounds: (a) mistake, inadvertence, surprise or excusable neglect; (b) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59.02; (c) perjury or falsified evidence; (d) fraud affecting the proceedings, other than perjury or falsified evidence; (e) the judgment is void, or has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it

is no longer equitable that the judgment should have prospective application; or (f) any other reason of an extraordinary nature justifying relief. The motion shall be made within a reasonable time, and on grounds (a), (b), and (c) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this rule does not affect the finality of a judgment or suspend its operation.

Whether to grant or deny a motion under CR 60.02 is within the trial court's discretion. *Love v. Walker*, 423 S.W.3d 751, 758 (Ky. 2014). Generally, we would remand to the Court of Appeals with directions to consider that issue. However, having reviewed the record, and for the reasons set forth above, we discern no abuse of discretion. Therefore, we hold that the trial court properly denied Eggemeyer's CR 60.02 motion.

### B. The trial court's sanction order must be vacated.

■ As set forth above, Eggemeyer moved for an order holding Dr. Jefferson in both civil and criminal contempt following the first trial. Both parties moved for sanctions and costs, and the court entered the following order on October 9, 2012:

> This matter is before the Court on Plaintiff's Motion for Sanctions and Costs and Defendants' Cross Motion for Costs as the result of a mistrial. The Court will take the issues raised in the motions under advisement and will wait to rule until the completion of the second jury trial, scheduled to commence on November 13, 2012.

---

11. We understand that the failure of Eggemeyer's fracture to heal had an indirect impact because, if the fracture had healed, Dr. Jefferson's second surgery would not have been necessary and Eggemeyer would not have become infected. However, Dr. Pugh, Eggemeyer's expert witness, was emphatic that his primary concern and issue with Dr. Jefferson's treatment was the failure to diagnose and timely treat the infection.

We note that the court did not state in that order that it was holding Dr. Jefferson in contempt, and the court did not state whether, how, or if Dr. Jefferson could purge himself of contempt.

Following the second trial, the court entered an order stating that it had "agreed with [Eggemeyer] that [Dr. Jefferson] was in contempt" as of the end of the first trial. The court stated that it treated "the matter as a civil contempt" but decided to wait to impose sanctions "to see if the doctor would cure or mediate his contempt."

The court then found that Whonsetler had, in defiance of a court order, stated in opening statement that "Dr. Jefferson was not liable for [Eggemeyer's] damages [because Eggemeyer] may have re-fractured his arm" after last treating with Dr. Jefferson. The court attributed Whonsetler's statement to Dr. Jefferson because "a client is responsible for the actions of his attorney," and "Dr. Jefferson knew that the 'second fracture theory' was a new theory unsupported by the evidence." The court noted that Whonsetler stated that Dr. Jefferson became aware of this second fracture theory after his deposition but before the first trial. However, Whonsetler could not explain why Dr. Jefferson did not testify about the new fracture, which the court believed would have absolved Dr. Jefferson of liability, during the first trial. The court was unconvinced by Whonsetler's argument that Dr. Jefferson was aware of the second fracture before the first trial. Therefore, the court determined that Dr. Jefferson, in concert with Whonsetler, devised this new theory after the first trial and that they devised a strategy to place this new theory before the jury. According to the court, it was those actions by Dr. Jefferson that convinced it to convert its finding of civil contempt to criminal contempt, and to award Eggemeyer costs and attorney fees.

"Contempt is the willful disobedience toward, or open disrespect for, the rules or orders of a court." *Commonwealth v. Burge*, 947 S.W.2d 805, 808 (Ky. 1996). There are two types of contempt, "[c]ivil contempt consists of the failure of one to do something under order of court, generally for the benefit of a party litigant." *Id.* The purpose of civil contempt is to compel behavior that will benefit a party opponent. *See Cabinet for Health & Family v. J.M.G.*, 475 S.W.3d 600, 611 (Ky. 2015). "For the punishment to retain its civil character, the contemnor must, at the time the sanction is imposed, have the ability to purge the contempt by compliance and either avert the punishment or at any time bring it to an end." *Commonwealth, Cabinet for Health & Family Servs. v. Ivy*, 353 S.W.3d 324, 334–35 (Ky. 2011). The sanction for civil contempt "may serve either to coerce the contemnor to comply with a court order, to compensate a party for losses caused by the contempt, or both." *Id.* at 334. Criminal contempt also involves the disregard of a court's order; however, its primary purpose is to punish the contemptuous conduct and to "vindicate the authority of the court." *J.M.G.*, 475 S.W.3d at 611. Punitive sanctions imposed for criminal contempt, unlike those for civil contempt, are "not subject to purgation." *Id.*

We reverse the Court of Appeals and vacate the trial court's order of sanctions for two reasons. First, although the court stated after the second trial that it agreed with Eggemeyer that Dr. Jefferson was in contempt following the first trial, the court never advised Dr. Jefferson of that finding. All the court did was state that it was going to take Eggemeyer's motion "under advisement." Second, the trial court never advised Dr. Jefferson that he could purge himself of his contempt or how he could do so. As we stated in *Ivy*, to

constitute civil contempt, the contemnor must have the ability to purge himself of contempt at the time the sanction is imposed. 353 S.W.3d at 334–35. Here, the court never imposed a sanction, or in fact made a finding of contempt, until after it was too late for Dr. Jefferson to purge that contempt. Therefore, the court's order imposing sanctions on Dr. Jefferson must be vacated.

Finally, we note that the court could have imposed appropriate sanctions on Dr. Jefferson for his conduct during the first trial. However, if those sanctions were based on a finding of contempt, the court was required to notify Dr. Jefferson that it was in fact finding him in contempt and whether that contempt was civil or criminal. If the court believed the contempt was civil, as it stated following the second trial, the court was required to specify how Dr. Jefferson could have purged himself of that contempt. If the court believed the contempt was criminal, it was required to find that Dr. Jefferson had willfully violated a lawful and reasonably specific order. *J.M.G.*, 475 S.W.3d at 618.

## IV. CONCLUSION.

For the foregoing reasons, we reverse the Court of Appeals and vacate the trial court's order imposing sanctions on Dr. Jefferson.

All sitting. All concur.